UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| **ANDREW MacVANE AND DENA MacVANE,** *Individually and as Personal Representatives of the Estates of Mackenzie MacVane*,  **PLAINTIFFS**  v.  **S.D. WARREN COMPANY, LLC.** *d/b/a* **SAPPI FINE PAPER,**  **DEFENDANT** | **CIVIL NO. 08-388-P-H** |

### DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This case arises from the tragic death of Mackenzie MacVane, a thirteen-year-old boy. He died after touching an active electric power line while jumping off a hydroelectric generation facility into the waters of the Presumpscot River, at a local swimming spot in Standish, Maine. S.D. Warren Company, L.L.C. ("S.D. Warren"), owns and operates the hydroelectric generating facility, which is adjacent to the swimming spot.

Mackenzie's parents, Andrew and Dena MacVane, sued S.D. Warren.[1] They assert one count of negligence under an attractive nuisance theory, claiming that

---

[1] The MacVanes brought this suit individually and as the personal representatives of Mackenzie's estate. In the summary judgment motion practice, however, they have conceded that they are not pursuing independent individual claims. Def.'s Statement of Material Facts ¶ 5 ("Def.'s SMF") (Docket Item 14); Pls.' Resp. to Def.'s SMF ¶ 5 ("Pls.' Resp. SMF") (Docket Item 18).

S.D. Warren failed to warn of danger at the site and failed to exercise reasonable care to eliminate the danger to children.  S.D. Warren has moved for summary judgment. I conclude that Maine's Recreational Use statute, 14 M.R.S.A. § 159-A (generally limiting landowner liability for injuries incurred in recreational activities such as swimming) forecloses liability.  I therefore do not reach the alternate argument as to whether Maine's attractive nuisance doctrine would create liability here in the absence of the statute.  I **GRANT** summary judgment to the defendant.

## FACTS[2]

S.D. Warren owns and operates the Eel Weir Dam, a hydroelectric dam and substation located in Standish, Maine, near the headwaters of the Presumpscot River.  Def.'s Statement of Material Facts ¶ 1 ("Def.'s SMF") (Docket Item 14); Pls.' Resp. to Def.'s SMF ¶ 1 ("Pls.' Resp. SMF") (Docket Item 18).  The Eel Weir Dam facility is surrounded by a chain-link fence, at least six feet high, topped with barbed-wire.  Def.'s SMF ¶ 17; Pls.' Resp. SMF ¶ 17.  A gate, chained and padlocked, allows proper entrance onto the premises to those with the key.  Def.'s SMF ¶ 18; Pls.' Resp. SMF ¶ 18.  On the day of the Mackenzie MacVane accident, however, there was a hole in part of this perimeter fence.  Def.'s SMF ¶ 29; Pls.' Resp. SMF ¶ 29.

On August 18, 2006, thirteen-year-old Mackenzie MacVane and two friends went swimming in the Presumpscot River near the Eel Weir Dam.  Def.'s SMF

---

[2] For purposes of summary judgment, I view the record in the light most favorable to the plaintiffs as the nonmoving parties, and draw all reasonable inferences in their favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).

¶¶ 4, 27; Pls.' Resp. SMF ¶¶ 4, 27.  Mackenzie decided that he wanted to jump from the Eel Weir Dam building into the river below.  He had successfully completed such a jump from the building's roof the day before while swimming with his older brother and his brother's friend.  Pls.' Statement of Add'l Facts ¶ 51 ("Pls.' Add'l SMF") (Docket Item 18); Def.'s Reply to Pls.' Add'l SMF ¶ 51 (Docket Item 21).

     Mackenzie gained access to the premises through the hole in the perimeter fence.  Def.'s SMF ¶ 29; Pls.' Resp. SMF ¶ 29.  He then climbed stairs to the topmost part of the main dam building.  Def.'s SMF ¶ 33; Pls.' Resp. SMF ¶ 33.  At the top of a flight of stairs, Mackenzie encountered and scaled another chain-link fence that was blocking his access to the main building's rooftop.  Def.'s SMF ¶ 34; Pls.' Resp. SMF ¶ 34.  In contrast with the perimeter fence, this roof fence was not topped with barbed wire, but the fence gate was chained and padlocked.  Photo Ex. SDW 0128 (Attached to Def.'s SMF) (Docket Item 14-11); Photo Ex. SDW 0142 (Attached to Def.'s SMF) (Docket Item 14-15).  To access the roof of a tower-like building adjoining the main building, Mackenzie then climbed an antenna pole using horizontal brackets extending off of the pole as footholds.  Def.'s SMF ¶ 36; Pls.' Resp. SMF ¶ 36.  Unlike the preceding day, Mackenzie did not jump from the roof of this tower, but instead chose to leap from a catwalk platform extending off of the side of the tower building, roughly forty feet above the Presumpscot River.  Photo Ex. SDW 0111 (Attached to Def.'s SMF) (Docket Item 14-5); Def.'s SMF ¶¶ 23, 38, 43; Pls.' Resp. SMF ¶¶ 23, 38, 43.  To reach the catwalk, Mackenzie had to drop down a short distance from the tower's rooftop

3

onto the platform. Photo Ex. SDW 0130 (Attached to Def.'s SMF) (Docket Item 14-12). Three 11,000 volt electrical transmission lines were connected to the tower building, attaching above the metal catwalk platform. Id.; Def.'s SMF ¶¶ 24, 43; Pls.' Resp. SMF ¶¶ 24, 43. When Mackenzie stood to jump into the river, he backed into one of the power lines. The shock knocked him off of the catwalk into the water below, resulting in his death. Def.'s SMF ¶ 46; Pls.' Resp. SMF ¶ 46.

Before Mackenzie's accident, S.D. Warren was on notice that swimmers, including children, frequented the area near the Eel Weir Dam facility. Pls.' Add'l SMF ¶¶ 96, 100; Def.'s Reply to Pls.' Add'l SMF ¶¶ 96, 100. The hole through which Mackenzie gained access to the premises had been present for at least a few months, and S.D. Warren had knowledge of repeated holes in the perimeter fence in the past. Pls.' Add'l SMF ¶¶ 85-87; Def.'s Reply to Pls.' Add'l SMF ¶¶ 85-87.[3] Furthermore, three years prior to Mackenzie's accident, S.D. Warren commissioned a private risk consulting company to conduct a security assessment of the Eel Weir station in Standish and another facility in a different town, Gorham, Maine. Pls.' Add'l SMF ¶¶ 70-71; Def.'s Reply to Pls.' Add'l SMF ¶¶ 70-71; Kroll, Inc., Security Survey and Analysis 18 (2003) (Attached to Pls.' Add'l SMF) (Docket Item 18-8).[4] This report stated that:

---

[3] S.D. Warren objects to paragraphs 85 through 87 of the MacVanes' additional statement of material facts, arguing that they are irrelevant for purposes of summary judgment. Def.'s Reply to Pls.' Statement of Add'l Material Facts ("Def.'s Reply to Pls.' Add'l SMF") (Docket Item 21). To the extent that these paragraphs relate to whether S.D. Warren exercised reasonable care in preventing children from accessing the premises, or whether S.D. Warren engaged in willful or malicious misconduct, they are relevant to liability.

[4] S.D. Warren raises multiple objections to the use of this report but otherwise does not admit, qualify or deny the facts therein contained. See, e.g., Def.'s Reply to Pls.' Add'l SMF ¶¶ 70-72, 75-77, 79. Because I conclude that, even with the report, the Recreational Use statute bars liability, it
*(continued on next page)*

> [T]he highest occurrence of crime at the site . . . is trespassing. This is a major issue . . . as the site is very tempting for trespassers. The site can also be very dangerous for these people therefore this simple misdemeanor must be taken very seriously. Damaged fence and graffiti indicates that the traffic in and around the dams is a common occurrence. Reports from the Line Crew indicate that the fences are continuously being mended due to unauthorized entry attempts.

Pls.' Add'l SMF ¶ 72; Def.'s Reply to Pls.' Add'l SMF ¶ 72.[5] The report pointed out that numerous holes in the perimeter fence at the Eel Weir facility "indicate[d] a problem with unauthorized access," and that these holes might "indicate to potential trespassers that [S.D. Warren] is not actively trying to keep people out." Pls.' Add'l SMF ¶¶ 76-77; Def.'s Reply to Pls.' Add'l SMF ¶¶ 76-77. Moreover, with respect to the other facility being assessed (in Gorham, Maine), the report expressly noted the potential for the type of accident that claimed Mackenzie's life:

> The roof of the building has been a regular issue as youths access the roof to jump into the water below. The biggest problem with this access is the presence of the electric lines on the roof of the building. If a person makes contact with these lines serious injury is possible. This has occurred in the past and is a major concern.

Pls.' Add'l SMF ¶ 75; Def.'s Reply to Pls.' Add'l SMF ¶ 75. For the Eel Weir Dam facility, the risk assessment company recommended that S.D. Warren "install[ ] more substantial outriggers on the side of the building and fencing on the roof above the stairway to ensure a person could not climb to the roof from this stairway." Pls.' Add'l SMF ¶ 79; Def.'s Reply to Pls.' Add'l SMF ¶ 79.

---

is unnecessary for me to rule on these objections.

[5] It is unclear from the report whether it is describing conditions at the Eel Weir Dam station or the other (Gorham) facility, or both. See Kroll, Inc., Security Survey and Analysis 3 (2003) (Attached to Pls.' Add'l SMF) (Docket Item 18-8). For purposes of this summary judgment motion, I assume
*(continued on next page)*

Private security officers patrolled the Eel Weir Dam property multiple times daily. Def.'s SMF ¶ 19; Pls.' Resp. SMF ¶ 19; Chance Dodge Dep. 8:16-9:7, Apr. 28, 2009 (Attached to Def.'s SMF) (Docket Item 14-25). Signs were posted throughout the Eel Weir Dam premises, including warnings of "No Trespassing" and "Danger High Voltage." However, Mackenzie may not have seen these signs on his path to the catwalk, because warning signs were not posted on the side of the building on which Mackenzie was swimming. See Pls.' Add'l SMF ¶ 58; Def.'s Reply to Pls.' Add'l SMF ¶ 58. Although a sign reading "Danger High Voltage Keep Out" was posted on a door directly across from where Mackenzie emerged through the hole in the fence, Def.'s SMF ¶¶ 26, 32; Pls.' Resp. SMF ¶¶ 26, 32, and an additional sign reading "Danger High Voltage Keep Out" was posted on a door leading into the tower building near the antenna that Mackenzie climbed to get onto the tower roof, Photo Ex. SDW 0117 (Attached to Def.'s SMF) (Docket Item 14-9); Def.'s SMF ¶ 37; Pls.' Resp. SMF ¶ 37, Mackenzie or other children may have understood the signs to refer to danger only *inside* the building through the doors on which the signs were posted. See Pls.' Add'l SMF ¶ 60, Def.'s Reply to Pls.' Add'l SMF ¶ 60. There were no warning signs expressly indicating that the cables attached to the tower above the catwalk were active electrical power lines. See Photo Ex. SDW 0130.

---

that the report is referring to the Eel Weir Dam facility.

### ANALYSIS

Maine's Recreational Use statute provides:

> An owner . . . of premises does not have a duty of care to keep the premises safe for entry or use by others for recreational . . . activities or to give warning of any hazardous condition, use, structure or activity on these premises to persons entering for those purposes. This subsection applies regardless of whether the owner . . . has given permission to another to pursue recreational . . . activities on the premises.

14 M.R.S.A. § 159-A(2). The statute defines "premises" as "improved and unimproved lands, private ways, roads, any buildings or structures on those lands and waters standing on, flowing through or adjacent to those lands." Id. § 159-A(1)(A). The statute expressly includes "swimming" in the definition of recreational activities, and states that the statute's coverage "includes entry of, . . . use of and passage over premises in order to pursue these activities." Id. § 159-A(1)(B). The Maine Law Court has held that the statute protects owners of commercial property and bars the claims even of children based on the common law doctrine of attractive nuisance. Stanley v. Tilcon Me., Inc., 541 A.2d 951 (Me. 1988) (holding that the statute prevented liability of the defendants where a fourteen-year-old was injured while tobogganing in the defendants' commercial sandpit).

Here, Mackenzie's swimming in the Presumpscot River, adjacent to S.D. Warren's land and the Eel Weir Dam, was a recreational activity as expressly defined in the statute. Furthermore, the S.D. Warren facility and land were "premises" under the statute. Mackenzie entered and passed over S.D. Warren's premises in order to pursue his swimming activities in the river, and thus the events as described fell within the parameters of the statute.

The MacVanes attempt to bypass the statute on two grounds: "Either . . . the statute does not apply to any property that poses an unreasonable risk of death or serious bodily injury to children, or . . . ownership of such property inadequately protected against a child's trespass is by definition willful." See Pls.' Opp'n to Def.'s Mot. for Summ. J. at 12 (Docket Item 17). I deal with both arguments.

As to the first, the statute does not exempt categorically "property that poses an unreasonable risk of death or serious bodily injury to children," and I decline to read such a limitation into the text. See Stanley, 541 A.2d at 952 (explaining that "[w]hen the language of the [Recreational Use] statute is clear and unambiguous, [courts] will give the statute its plain meaning," and refusing to read in a limitation that was not specifically listed in "[t]he exceptions expressed in the statute to the rule of limited liability"). The Maine Law Court has expressly advised that the immunity provision of the Recreational Use statute should be broadly construed. Dickinson v. Clark, 767 A.2d 303, 305 (Me. 2001).

As to the second, the question is whether a statutory exception, imposing liability for "willful or malicious failure to guard or to warn against a dangerous condition, use, structure or activity," applies to Mackenzie's accident. There are no Maine cases defining "willful or malicious" under the Recreational Use statute itself. But there are several cases interpreting those terms under Maine common law. For instance, in describing the duty of a landowner to trespassers in general, caselaw makes clear that "simple failure to make . . . premises safe for trespassers does not rise to the level of wanton misconduct forbidden under Maine law."

8

Bonney v. Canadian Nat'l Ry. Co., 800 F.2d 274, 276 (1st Cir. 1986) (holding that where a fifteen-year-old trespasser fell off a railway bridge crossing at night and drowned in the river below, the railroad's failure to install guardrails, lighting, warning signs, barriers or walkways, despite knowing that pedestrians often crossed the railway bridge, did not rise to the level of willful or wanton misconduct). The Maine Law Court has held that maintaining dangerous electrical lines near a sawdust pile was not "wanton, wilful [sic] or reckless" where a child of an employee, who lived by invitation on the defendant sawmill's land, climbed the pile of sawdust and came into contact with an electric wire. Lewis v. Mains, 104 A.2d 432, 434 (Me. 1954). In another case, a work train engine ran over a six-year-old boy (causing a leg amputation) while he was crossing tracks near his home. The Law Court held that the railroad's conduct was not willful or wanton even though the railroad knew that school children had a habit of crossing the tracks and did not make "express objection" to the practice. Willey v. Me. Cent. R.R. Co., 18 A.2d 316, 319-20 (Me. 1941); see also Kapernaros v. Boston & M. R.R., 99 A. 441, 442 (Me. 1916) (rejecting a conclusion of willful or wanton misconduct in the death of a less-than-two-year-old child playing on railroad tracks, where the railroad "had reason to anticipate that children might be on the track at or near the spot where the child was"). The Law Court has also held more recently that it was not willful or reckless for a school to store, with no warning signs, flammable material in an unlocked shed on the school's playground. Collomy v. Sch. Admin. Dist. No. 55, 710 A.2d 893 (Me. 1998) (twelve-year-old boy

9

trespassing in the shed was injured by ignited fluid obtained through an unlocked and ajar door).

Under Maine law, then, failing to mend a hole in a barbed-wire-topped perimeter fence is insufficient to rise to willful or malicious conduct. See Collomy, 710 A.2d at 897 (explaining that "[e]ven viewed in the light most favorable to the plaintiff, the School District's acts of leaving flammable materials in the cinder block building on the playground, leaving the door unlocked, and failing to post warning signs on the property do not rise to the level of 'wanton, willful or reckless behavior'"). I cannot accept the MacVanes' argument that, under the Recreational Use statute, where property "poses an unreasonable risk of death or serious bodily injury to children, . . . ownership of such property inadequately protected against a child's trespass is by definition willful." Pls.' Opp'n to Def.'s Mot. for Summ. J. at 12. Instead, in Stanley, the Law Court applied the Recreational Use statute to bar a trespassing child's attractive nuisance claim (which, under Maine law, requires "a condition . . . involv[ing] an unreasonable risk of death or serious bodily harm to . . . children," see Restatement (Second) of Torts § 339, adopted as Maine law in Jones v. Billings, 289 A.2d 39 (Me. 1972)).[6] Here, although S.D. Warren failed to place warning signs on the river side of the Eel Weir Dam facility

---

[6] The MacVanes prefer a definition of "willful" used in a First Circuit administrative law case, defining willfulness as "show[ing] 'indifference' to the rules; [the defendant] need not be consciously aware that the conduct is forbidden at the time he performs it, but his state of mind must be such that, if he were informed of the rule, he would not care." Brock v. Morello Bros. Constr., Inc., 809 F.2d 161, 164 (1st Cir. 1987). The court in Brock was interpreting a provision of the federal Occupational Safety and Health Act, 29 U.S.C. § 666(a), in an enforcement action by the Secretary of Labor against a construction company for violating Occupational Safety and Health Administration rules. For the Maine law question in this case, however, available Maine state law governs, not federal statutory interpretations.

or to follow all the recommendations of the risk consultants' report, it did post multiple signs, including signs describing high voltage danger on doorways visible to Mackenzie in his ascent to the tower rooftop. Furthermore, S.D. Warren installed a second padlocked fence blocking access to the roof of the main building, and hired a private security patrol to monitor the premises. Such precautions, although they were insufficient to prevent Mackenzie's tragic death, belie any argument that S.D. Warren's conduct was willful or malicious. It had taken steps to prevent access to the roof and to warn of dangerous high voltage.[7] That S.D. Warren knew or had reason to know that children were trespassing into the Eel Weir Dam property is alone insufficient to find that S.D. Warren acted willfully or maliciously under Maine law. See, e.g., Bonney, 800 F.2d at 276; Willey, 18 A.2d at 319-20; Kapernaros, 99 A. at 442.

Because of Maine's Recreational Use statute, I **GRANT** summary judgment to the defendant.

**SO ORDERED.**

**DATED THIS 11TH DAY OF AUGUST, 2009**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

[7] Indeed, the MacVanes' complaint asserts only negligent conduct in their pursuit of the attractive nuisance claim. Compl. ¶¶ 17-23; see also Jordan v. H.C. Haynes, Inc., 504 A.2d 618, 619 (Me. 1986) (holding that the plaintiffs' negligence claim in their complaint, coupled with their allegations that the defendant made no effort to warn or place barricades near a hazardous condition, were insufficient to raise a factual issue of willfulness or maliciousness under the Recreational Use statute, even if the defendant had knowledge that people often traversed the property over the hazardous condition).